50654, United States of America v. Charles Augustus Banks. Appellant, ready to proceed. Thank you, Honor. Good morning. May it please the Court, my name is Ben Wagner. I'm with the law firm of Gibson, Dunn & Crutcher, and I represent the appellant, Charles Banks. I'd like to reserve five minutes for rebuttal. Charles Banks pleaded guilty in the Western District of Texas to a single count of wire fraud involving a transaction with former San Antonio Spurs superstar Tim Duncan. At the sentencing in this case in San Antonio, the government did more than simply leverage the optics of a case involving a hometown hero. They overreached, seeking a sentence based on a loss amount of $13.5 million, which vastly overstated the loss actually caused by the offense in this case. And that loss figure was based on a variety of allegations untethered to the offense in this case, which were not charged, were not proven, and certainly were not admitted by the defendant. The district court failed to scrutinize the government's case, the government's theory of loss. The district court made no findings on key issues. It did not explain its reasoning or state why it selected the sentence that it did. In doing so, the district court committed fundamental errors in the application of Sentencing Guideline 2B1.1. These errors had the result of raising the offense level by 22 levels from a 0 to 6 sentencing guideline range up to 78 to 97 months in prison. Under Gall v. The United States, these errors in the interpretation and application of the guidelines, which are reviewed de novo, affected the sentence and require remand. The district court also erred in calculating the loss amount and applying the two-level adjustment for deriving funds from a financial institution. In admitting his guilt, the defendant surrendered to serve his sentence. He's already served 8 months of his 48-month sentence. He liquidated all of his assets to satisfy his civil creditors and the victim in this case. He's not contesting the base offense level or the adjustment for abuse of a position of trust. The restitution issue is moot. All he seeks in this appeal is a fair shot at a fair sentence based on the rule of law and the actual offensive conviction in this case. Well, Mr. Banks, that's all very appealing, but Judge Beery did depart downward considerably, didn't he? He did depart downward. However, as this court has noted before, a downward departure doesn't necessarily render the errors harmless. In this case, he didn't state why he selected the sentence that he did. The only thing that he said was that the 78 to 97 months seemed too high to him. So certainly the errors here affected his view of the sentence in this case. He started with a faulty guideline calculation, and that requires remand under this court's precedent. And you're saying that calculation is faulty based on the loss amount? Yes. You don't complain about the $6 million loss amount? I do, Your Honor. I do, and I will turn to that immediately. So under the guidelines, as Your Honor knows, actual loss must be reasonably foreseeable, pecuniary harm that resulted from the offense. That's the definition from Note 3A1 of the sentencing guideline. So starting with that $6 million, that was a loan by Comerica to GameDay that was guaranteed by Tim Duncan. That transaction resulted in no pecuniary loss to the defendant. Pecuniary harm under the guidelines means, quote, harm that is monetary. No pecuniary loss. You said the defendant. I'm sure there's no pecuniary loss. I'm sorry. I used to work for the government, Your Honor, so sometimes I get that confused. It resulted in no pecuniary harm to the victim, to Mr. Duncan. And pecuniary harm has to be monetary. Has the loan been repaid? Your Honor, it was never lost in the first place.  And it is extremely unlikely that he will ever have to pay anything on that in the future. Okay. Well, let me ask it another way. Yes. What happened to the loan? The loan, Your Honor, was a loan by Comerica Bank. It was Comerica Bank's money. Tim Duncan had no money out of pocket on that loan. He guaranteed the loan. The loan has now $1.9 million has been repaid by the co-guarantor, Kevin Garnett. He was a co-guarantor on that loan. Comerica Bank has never looked to Mr. Duncan to collect on that loan. Does he remain a co-guarantor on the loan? He is theoretically liable in the future, Your Honor. Theoretically? Yes, theoretically. What does the document say? Well, there's some dispute about that. At one point, Comerica Bank had completely offered to completely release Mr. Duncan from the loan. That apparently did not happen. They then signed an agreement with Kevin Garnett, which supersedes that agreement, in which he is completely liable for the loan. Now, it hasn't excused Mr. Duncan's liability. So, in theory, they could still pursue him for the loan. But Mr. Duncan, importantly, has completely— In theory? Yes. I have a question. Go ahead. I'm sorry. Go ahead, Judge Young. No, that's okay. I thought that in these loss calculations based on pecuniary amounts, that it was the amount that was reasonably foreseeable or intended. And when you ask someone to guarantee a loan, that means that they are legally on the hook for the liability. And therefore, he cheated him into being legally liable. Right? Well, Your Honor, this has never been about intended loss, this case. The government has never asserted an intended loss case. And, of course, Mr. Banks, who lost as much as anybody when game day failed, never intended— It is extremely fortuitous that these other circumstances have intervened. Otherwise, he would be—his liability under the declining circumstances of this company would be reasonably foreseeable. Well, I think the problem that I'm looking at under actual loss, I agree that reasonable foreseeability is an important part of that. But there has to be pecuniary harm. And in this case, he hasn't paid anything. And because of these arrangements with Kevin Garnett to cover the loan, he's already paid $1.9 million of it, by the way. So he'll never be liable for the whole $6 million, no matter what happens. And Mr. Duncan himself has denied liability for the loan, has told Comerica Bank he's not going to pay it. So it's extremely unlikely that he'll ever be called upon. And in the years that have passed since the default, the bank has never called upon him to make good on that loan. And as this court said in the Russell case, in an opinion by Your Honor, Judge Graves, it's error to count as loss speculative loss in the future. This is speculation that someday the bank may change its mind before the statute of limitations runs. I'm not even sure when that is, but at some point that they may pursue him. They haven't pursued him all these years. $1.9 million has already been paid, and he's never paid anything so far. So our view is no pecuniary loss. Second thing about the $6 million, as I mentioned, there's no dispute that $1.9 million at least has already been paid on that amount. So even if there were some likelihood of his paying that in the future, it certainly isn't the $6 million face amount that the court defaulted to. But Mr. Banks got the $6 million. No, it went to game day, Your Honor. It went to game day, which then failed. Mr. Banks lost when game day went down as well. Mr. Banks was a shareholder. He lost millions in the course of this entire travesty, Your Honor. So it didn't come to him. So same with the $7.5 million loan, which is the other part of this $13.5 million figure. That figure was a loan that was made back in 2012, and there was no fraud in the origination of that loan. Nobody has alleged that or proven that. The issue there is that there was a pecuniary loss on that loan. So when game day failed, that loan was taken out by Mr. Duncan. He took out $7.5 million from Comerica Bank and lent it to game day as part of an interest rate arbitrage investment strategy. When game day failed, he did lose $7.5 million, but the important thing there is it was not a loss from the offense in this case. So when Mr. Banks called him or texted him and said that I need you to sign a $6 million. The guarantee, correct. Right. And he said this is going to reduce what's owed on the $7.5 million by $1.5 million. Right. That's what he said in the text message. Yes. So he induced him to sign this $6 million guarantee by telling him that it was actually reducing the $7.5 million loan. Isn't that right? That's absolutely right. So he connected the two transactions. I'm sorry? He connected those two transactions. Yeah, he referred to that earlier transaction, and he subrogated that. I completely agree with that. But the point is – And when you say subrogated, what he did is, is Tim Duncan on the $7.5 million stood first in line. That's not correct. I think that part is not correct, Your Honor. The government's misstating that part. I believe it has, Your Honor. Tell me what? Tell me about it. There's no evidence that he was first in line here. There's nothing that was – there was no finding by the district court. There was no evidence that was presented in the sentencing hearing. There's some – Wait a minute. Did you say interest? I'm sorry? You didn't? I mean, I assumed, I understood this, that he had a first lien on the asset. I don't think it's correct to say he was first in line. There was a preexisting loan of $8 million. There's testimony about it that preceded his loan. Answer my question. Did he have a lien on the asset? I believe he did. I believe he did. And so I think – And he has a lien. And then he was tricked into subordinating his lien to that of the bank. I agree with that. Okay, fine. I agree with that. But the issue with the subrogation is that there was no – the loss did not flow from that event. Nobody recovered any money at the time that Game Day failed. The issue is what is the offense in this case. The offense in this case is what he pleaded guilty to, certainly the subrogation. But the loan itself was made back in 2012, had nothing to do with the crime in this case. The fact that – if this transaction in 2013 involving the text that Jana just described had never happened, Mr. Duncan still would have lost that $7.5 million. He lost it not because he was subrogated, not because anybody else got assets ahead of him. He lost it simply because he was an investor in Game Day and all the investors lost when Game Day failed. Nobody lost except Mr. Banks until, of course, he got caught. Is Mr. Banks from San Antonio or from – is he from California? He's actually from Georgia, Your Honor. I believe he was living in California for quite some time. He's not from Texas. Okay. So the $7.5 million, our position is that it was subrogated as part of the transaction that he pleaded guilty to today. But, again, as this court has repeatedly said, there has to be the loss actually caused by the offense. And that raises an important dispute that we have with the government about what is the nature of the offense in this case. The defendant pleaded guilty in this case pursuant to a – without a plea agreement. He pleaded guilty and filed a detailed factual basis. It's at pages 440 to 444 of the record on appeal. And as I believe Judge Rievele wrote in the Lozano case, when there's a guilty plea, you look at what is the mutual understanding of the parties. That's what defines the scope of the offense that you're looking at. The factual basis, it's actually not that far off from the superseding indictment count too. But the factual basis is what defines the offense to which the defendant pleaded guilty. And here, it's all about that transaction in 2013. It has nothing to do with the failure of game day, with other issues that the government spent a lot of time on at the sentencing hearing. It really had to focus on that transaction. He's pleaded guilty to that. He's acknowledged the fraud. But the losses – the government really agrees with us that the losses were caused by the failure of game day. And that is something which was not part of the offense, and therefore there was not a loss that flowed from that. If I can just comment very briefly on the financial adjustment. He received a two-level adjustment for financial – for deriving more than a million dollars from a financial institution as a result of the offense. Just two things about that. One, as a matter of law, as this court said in Sandlin in 2009, the language of the adjustment requires that the money be derived as a result of the violation of the statute. Again, the funds that – the offense here, the violation had to do with that transaction back in 2013. The money that the government – and there was really no proof of this, no findings by the district court. But the money that the government now points to, $1.5 million in their brief, is listed on their – they point to their chart on – at 2064 of the record on appeal. And of the $1.5 million that they say flowed to the defendant from the bank are all transactions, funds after the $6 million funding, money that went from game day to then to various entities associated with Mr. Banks. Not to Mr. Banks directly. Much of it went to something called Hammer Holdings or to something called Pewter Holdings. There was very little testimony about what those are. They're partnerships in which Mr. Banks owns a portion and other people own a portion. So it wasn't money that went to Mr. Banks. Also, the funds that – But every place it went, he was involved? I'm sorry? Every place the money went, Mr. Banks was involved? He was involved. He was involved. But it's more than – the Colton case, which the government cited in their brief, it's a Fourth Circuit case from 2000. That case, in a – applying a similar adjustment from 2F1.1, said it wasn't enough that money goes to an entity which is a 50-50 ownership by the defendant. It's not enough for application of this amendment, of this adjustment. And finally, the money that they describe as going to him, the first payment is three months after the transaction with the bank. And they are counting payments that went to Mr. Banks two and a half years later out of Game Day. This is in a two-year period when Game Day was earning $80 million in revenues. There was lots of financial activity going on. They made no effort to track these funds coming from the bank going to Mr. Banks. It just went into a large company that was doing a lot at the time. And over a two-year period, there were various payments to entities, much of which was previously agreed to in fees that he was entitled to, or to Hammer Holdings, which was the largest shareholder of Game Day. To a question, you had the opportunity to present all this at sentencing. A, did you do it? And B, how do you contradict what I believe it was the trustee found or the CFO that Mr. Banks was basically taking money out of Game Day for his own purposes? Well, there were two people that testified from Game Day. One was a junior controller, his first job out of college, who testified for the government. And then there was the receiver of Game Day who testified for Mr. Banks. And their testimony, the controller who had been the CFO of the company testified in Mr. Banks' favor, really, that much of these fees he was entitled to. But there was no allegation of criminality in that. It may have been bad business activity. It may have been sleazy business activity. There was no proof that any of this conduct was criminal. And most importantly, the issue that we are most insistent upon and that we insisted upon in the hearing before the district court is that the failure of Game Day is not what this case was about. It's not what he pleaded to. It's not what he was charged with. It was just the government conceded until Game Day failed in 2017 that this was a no-loss case. After the company failed, they tried to make this a loss case about the failure of Game Day. And that was just not what the offense was about in this case, Your Honor. I see my time has expired. I'll turn it over to Ms. Barringer. May it please the Court, Elizabeth Barringer from the Western District of Texas on behalf of the United States. I'm going to first address this sort of $6 million piece. I think that's more the obvious guideline loss in this case. The defrauding of Duncan allowed the defendant to get a loan from Comerica. That loan failed. There was a specific court finding that both Duncan and the bank and Garnett were the victims of this offense. And that comes from paragraph 27 of the pre-sentence report, which the district court adopted those factual findings. So we have a finding that Comerica was a victim and suffered the actual loss in this case. I mean, the loan came from Comerica. It didn't come from Duncan. The fraud happened on Duncan to get the loan from Comerica. So once that loan was defaulted, Mr. Banks certainly knew that this Game Day was struggling. It wasn't able to qualify for the loan on its own. It was over-leveraged, under-capitalized. And at that point, it was certainly foreseeable, even absent his fraud on the back end, that that loan could fail. And that's what made it a 2B1.1 loss. But in this case, of course, we have even more. After the $6 million Comerica loan demanded, the defendant continued to loot Game Day as he had since 2012. So this money made it even more foreseeable that that loss would occur. I'm going to now address the $7.5 million component of it. Now, at the time the defendant deceived Tim Duncan into subordinating his interests, he was also looting Game Day. So it was reasonably foreseeable that Duncan would then lose that $7.5 million. And we talked a lot, the Defendant's Counsel talked a lot about how the offense that was proven at sentencing was untethered to the offense charge. And this is simply untrue. The scheme to defraud here was very clearly set forth from the very beginning of the case. And that was the defendant's plan to get money from Comerica to fund Game Day so that he could take money out of Game Day for his own personal use. This is what was charged by the grand jury. I direct the court's attention to Record Site 80, where it said that the point of the scheme was to receive commissions and payments for his own personal use. This was the scheme that was presented by the government at the change of plea. It is the government's position that this is the scheme to which the defendant pleaded guilty. There was no mutual understanding of the parties here. He pleaded guilty unconditionally to count two of the indictment. There was no plea agreement. And even if we differ, even if the defendant has a different view of what he pledged to than the government, the government was entitled to prove the scope of the loss resulting from the scheme at sentencing, and it did. And I just want to direct the court's attention to some several findings that the district court did make, because there's apparently some dispute about the district court's findings. Most importantly, the only disputed aspect of this case was loss. And the district court, that was its factual finding. That was the finding of the district court was loss. The district court need not make specific explicit findings on the record for every inferential step that's embedded in that determination. And it did make some findings, though. For instance, when it went to, it found that the defendant controlled Game Day, that it wasn't Neal, that it was the defendant that was pulling the strings and controlled and told Neal what to do. And I direct the court's attention to page 1098 of the record. But most importantly, it adopted the factual findings in the pre-sentence report where the scheme was fully set forth, directing the court's attention to paragraphs 20 and 21 and 22. It details the scope of the scheme, that none of the loans or fees the defendant took from Game Day were documented or repaid. He made no payments on these loans. That the chairman of the board and majority owner of Game Day, and that Magnum- You're talking about the $7.5 million? I'm talking about, well, the scope of the scheme itself. I mean, I think the scheme relates to both the $6 million- I'm just asking which loan are you talking about? I'm sorry. The looting that was occurring from the defendant taking the money from Game Day, he was taking loans that he never repaid and were not properly documented. The controller testified that this is not the way they did business with any of their other people who took loans from the company. It wasn't industry standard. So he was clearly looting the company here, and that was within the scope of the scheme. And it made that $7.5 million loss foreseeable. How do we know it's foreseeable? We know we have to have actual and proximate cause. Well, we know for the looting of the company, that caused that $7.5 million loss. We know that his looting resulted in that. And then as far as proximate cause, it was certainly reasonably foreseeable when he made him subordinate that $7.5 million interest. So both of those components are present in this case as far as foreseeability. Tell me what you mean when you say subordinate. Subordinate his loans. He says there's no evidence that he was the first in line as a creditor on the $7.5 million. I'm glad to clarify that, Your Honor. So Tim Duncan's interview with the FBI agents, he was twice interviewed by— I think I just wrote this down, which page of the record it was in. But it was attached to one of the defendant's pleadings, objections to the pre-sentence report, and Tim Duncan was interviewed twice. And he testified that he was the first position and first in line and that if anything would happen to Game Day, he would be paid first. And that's right out of the FBI report. I mean, that's a, you know, that's a lay expression of what he thought he had. Did he have a lien on assets? The only evidence in the record of what that interest was was based on that interview of Tim Duncan and the testimony of Wendy Kowalik, his accountant. So both of those provide evidence in the record. The actual lien itself was not admitted into evidence. I don't think that's necessary given the standard of proof. But I also want to direct the court's attention to— Erringer, it would have taken you about 10 minutes to look up a UCC statement assuming these were, you know, movable assets in the public records. Well, the defendant admitted that he subordinated his interest. So he obviously had an interest in it. And the evidence at trial was what that interest was, was a first position interest. I mean, that is the only evidence in the record. And I agree it could have been proven up differently. But for purposes of sentencing, it was certainly sufficient to have Tim Duncan's statement as well as the defendant's admissions at the change of plea. Let me advise you for the future. We're talking commercial fraud. It is the essence of commercial law that you are either an unsecured creditor or a secured creditor. Subordination means that as a secured creditor, you have offered to step— you have been allowed or procured or whatever to go behind other secured creditors. And therefore, these are matters of established commercial fact. And I expect never to see another lost case like this without UCC-1. Well, I will certainly convey that to my office. But as far as whether he had a priority interest in this $7.5 million, this is undisputed. And how do we know that? Comerica would not give that $6 million loan unless Tim Duncan subordinated that interest. So obviously, there is evidence in the record and, again, a specific finding from the district court in— one moment, please—about his first priority interest. I'll get back to the court on that. If there is a paragraph—oh, paragraph 11 is where the district court adopted the pre-sentence report's finding in paragraph 11 about that first priority interest. So in light of that interest and in light of deceiving Tim Duncan into subordinating the interest, it was reasonably foreseeable that Duncan would lose that $7.5 million once Gameday inevitably defaulted on that loan. And I do want to clarify something that keeps reappearing in this case about the $200 million to $250 million company. So, yes, there was testimony that from 2010 to 2015, Gameday made $200 million to $250 million in gross revenue. But there was also testimony that 80% of that went to the overhead expenses of the team contracts and the cost of goods sold, like to Nike or Under Armour or whatever those places—whatever their contracts were. So 80% of that is just off the top, not even part of their net earnings. So now they're down to 20%, and that's about $40 million. This is in the redirect of Tony Magnow. That's the net revenue, and that doesn't even include employee salaries. That doesn't even include taking out for taxes. So $40 million, when you're taking $6.5 million from $40 million net, that's certainly a lot different than taking it from a $200 million to $250 million company. One moment, please. Okay, and I also want to talk a little bit about a defendant's ability to narrow his sentencing liability under this scheme. He said that he's allowed to just at sentencing admit to certain facts, and that's all the court can hold him accountable for. And certainly to the extent that Apprendi would apply or due process would apply, that would be true. But this is an analogy. We have some sort of Title 21 defendant who pleads guilty to 50 kilograms more of a certain controlled substance, and he insists at sentencing, and there's no plea agreement, that he's only accountable for 51. That doesn't mean at sentencing that we're limited to his admissions that were untethered to a plea agreement between the parties about what the quantity was. This is a sentencing determination. I also would like to note that with respect to deriving the gross receipts from the financial institution, and we're talking about whether Hammer Holdings was 50% or more or where that went, we're talking about game day here. The money went from Comerica to game day, which the district court found the defendant controlled. He was the controlling person, the chairman of the board, the majority shareholder. The district court made a specific finding of fact based on the e-mail trail between him and Neal, that he was the one controlling the company and pulling the strings like the Wizard of Oz. So in that case, when he's directing how that money is being paid when it goes from Comerica to game day, that is where he indirectly derives that money. It's not when he ultimately derives it from Hammer Holdings. Now, I do want to say that this issue was fully litigated below. This was both parties had a different theory of what the loss was in this case since the change of plea. The government insisted it was the $13.5 million, and the defendant insisted it was zero. They both fully litigated their position. They both called witnesses. It was fully litigated in the pleadings, and the government, its theory prevailed in the district court. The district court adopted the government's findings, and that's not clear error when it's supported by the record. This court may have a different view of what the loss is, but that doesn't mean that Judge Burry's finding was clearly erroneous. And if there are no further questions, I yield the rest of my time. Roboto. Thank you, Honor. Just a few points. First, on the issue of what the offense was and what the defendant pleaded to. The government has said just now and said in its brief that he unconditionally pleaded guilty to the superseding indictment and, therefore, that the offense is however they charged it in the charging document. Well, that's just not the law. The law is when you plead guilty pursuant to a plea agreement, or in this case, not a plea agreement, but you plead guilty, the issue is you look at the guilty plea, the facts that were accepted by the district court as the basis for that plea. The defendant submitted a detailed factual basis. The district court accepted that factual basis and accepted the plea on that factual basis. The government, in fact, urged the court to accept the plea on that basis and to make a finding that that was a violation of a wire fraud statute. So under Lozano, which quoted Adams, that's what you look to, and there's nothing in there. And, in fact, there's nothing in the superseding indictment, if you want to look at that, about the looting of game day. The looting of game day, so-called looting of game day, had nothing to do with this case. I'm not saying that there was no wrongdoing there, but it was never charged, it was never proven, and it wasn't even relevant in this case until after game day failed. The government realized they have a high-profile defendant with no loss, so then they have to talk about the looting of game day, and that's where this theme developed. And when we showed up for the sentencing hearing, it wasn't about the offense or what flowed from the offense. It was all about what happened in game day years later. And so our view is the losses here, Comerica Bank, by the way, never claimed it was a victim here. Kevin Garnett never claimed it was a victim here. Comerica Bank never showed up at the sentencing hearing, and it may be because Tim Duncan's accountant, who testified at the hearing, suspected Comerica Bank of being involved in fraud against Tim Duncan. She said so at page 924 of the record on appeal. So they were not victims in this case. Secondly, on this issue of banks controlling game day, there was testimony. He'd never been to the offices of game day. He'd never been seen in the offices of game day. Mr. Manganall, the former controller who testified for the government, said he'd never met Mr. Maggs. He'd never even talked to him on the phone. So certainly I'm not saying he wasn't heavily involved in game day, but this was not a personal corporation. This was a legitimate sports merchandising company that made well over $200 million in revenues during the period that was active over several years. I'm not saying it was well managed, but this was not some sham company that Mr. Banks was just using to move money around. These were real employees, real contracts with the warriors who will soon be the NBA champs. Sorry about the spurs. But this was a real company that was doing real work. And so to turn this into a case about game day, if they wanted to do that, they should have charged it and should have proven it and should have convicted him of that. Any questions, Your Honor? Okay. I appreciate your attention. Thank you. Thank you, counsel. We'll call the next case of the day.